FILED
NOV 17 2011
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WILDEARTH GUARDIANS<br>516 Alto Street<br>Santa Fe, New Mexico 87501<br><br>SIERRA CLUB<br>85 Second Street, 2nd Floor<br>San Francisco, CA 94105<br><br>ENVIRONMENTAL INTEGRITY PROJECT<br>1 Thomas Circle, Suite 900<br>Washington, D.C. 20005<br><br>and<br><br>CENTER FOR BIOLOGICAL DIVERSITY<br>1333 North Oracle Rd.<br>Tucson, AZ 85705<br><br>        Plaintiffs,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY, a federal agency,<br>Ariel Rios Building<br>1200 Pennsylvania Ave. N.W.<br>Washington, D.C. 20460<br><br>and<br><br>LISA P. JACKSON, in her official capacity<br>as Administrator of the U.S. Environmental<br>Protection Agency,<br>Ariel Rios Building<br>1200 Pennsylvania Ave. N.W.<br>Washington, D.C. 20460<br><br>        Defendants. | CIVIL ACTION NO. _____<br><br>Case: 1:11-cv-02064<br>Assigned To : Leon, Richard J.<br>Assign. Date : 11/17/2011<br>Description: Admn Agency Review |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

RECEIVED
Mail Room
NOV 17 2011
Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

## INTRODUCTION

1. Coal mines throughout the country are a significant source of air pollution, spewing methane, volatile organic compounds, and particulate matter into the atmosphere. These pollutants all endanger human health. The pollution is emitted from mine ventilation systems, explosions used to rip apart the earth, and other systems and practices.

2. EPA regulates scores of stationary sources under its "new source performance standard" program, but not coal mines. In light of EPA's omission of coal mines from the list of stationary sources subject to new source performance standards, Plaintiffs WildEarth Guardians et al. (collectively, "Conservation Groups") filed a petition ("the Petition") with EPA in June 2010, requesting that the agency take three steps toward regulating coal mine pollution:

> (1) List coal mines as a category of stationary sources that emit air pollution which may reasonably be anticipated to "endanger public health or welfare" in accordance with 42 U.S.C. § 7411(b)(1)(A);
>
> (2) Establish federal "standards of performance" for new and modified sources within the newly listed stationary source category for coal mines in accordance with 42 U.S.C. § 7411(b)(1)(B); and
>
> (3) Concurrently establish federal "standards of performance" to address emissions of methane from existing facilities within the newly listed stationary source category for coal mines in accordance with 42 U.S.C. § 7411(d)(1) and 40 C.F.R. § 60.22.

3. The Petition has languished before EPA for more than a year without any action by the agency. This delay permits coal mines to continue to pollute the air without the benefit of standards of performance designed to protect human health. EPA's delay in responding to Conservation Groups' petition is unreasonable. Conservation Groups bring this suit to compel EPA to respond to the Petition.

COMPLAINT for Declaratory and Injunctive Relief  
WildEarth Guardians et al. v. U.S. Environmental Protection Agency (D.D.C.)  
Page 1

## JURISDICTION, VENUE, AND NOTICE

4. This Court has jurisdiction over this action pursuant to the following statutes: 42 U.S.C. § 7604(a) (citizen suit provision of the Clean Air Act), 5 U.S.C. § 706 (Administrative Procedure Act), 28 U.S.C. § 2201 (declaratory judgment); 28 U.S.C. § 2202 (injunctive relief); 28 U.S.C. § 1346 (U.S. as a defendant), 42 U.S.C. § 7604(d) (costs and attorney fees provision of the CAA), and/or 28 U.S.C. §§ 2412 et seq. (Equal Access to Justice Act).

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because the federal defendants – EPA and its Administrator – both reside in the District of Columbia, and because a substantial part of the events and omissions giving rise to the claim occurred in this district. Venue is also proper because an appeal of any final agency action EPA takes on this matter would be had in the U.S. Court of Appeals for the District of Columbia Circuit. See 42 U.S.C. §§ 7604(a) and 7607(b)(1).

6. The Conservation Groups sent a letter to EPA on April 8, 2011 notifying the agency of the groups' intent to sue EPA within 180 days for failure to timely act on the Petition as required by 42 U.S.C. § 7604(a). EPA received the notice letter on April 13, 2011. The 180 day days required by statute expired on October 10, 2011. As of the filing of this complaint, EPA has failed to provide a substantive response to the Petition.

## PARTIES

7. Plaintiff WILDEARTH GUARDIANS is a Santa Fe, New Mexico-based nonprofit organization with offices in Denver and members throughout the American West. WildEarth Guardians is dedicated to protecting and restoring the wildlife, wild places, and wild rivers of the American West, and to safeguarding the Earth's climate. WildEarth Guardians has

members throughout the American West, including Colorado, that utilize the region that will be affected by the West Elk methane venting. WildEarth Guardians and its members work to reduce harmful air pollution to safeguard public health, welfare, and the environment.

8. The Sierra Club is a national nonprofit organization of approximately 1.3 million members and supporters dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.

9. The Environmental Integrity Project combines research, reporting, media outreach, and litigation to ensure that environmental laws are enforced, are effective, and inform and empower the public.

10. The Center for Biological Diversity works through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction. The Center's Climate Law Institute develops and implements legal campaigns to limit global warming and other air pollution to protect the environment and public health. The Center has over 30,000 members with a vital interest in the immediate reduction of greenhouse gas pollution under the Clean Air Act as one of the primary solutions to the climate crisis.

11. Members of each of the Conservation Groups live, work, raise their families, and/or recreate, and will continue to do so on a regular basis, within and around areas impacted by ozone and particulate pollution caused by coal mines. For example, members of WildEarth Guardians and Sierra Club have recreated for at least several days each year for the past three years on national forest and other federal public lands leased to coal mines near Paonia, Colorado

and in Wyoming's Powder River Basin, among other places. These members are adversely affected by exposure to ozone and particulate matter caused in part by coal mines. The adverse effects of such pollution include actual and/or threatened harm to their health, their families' health, their professional well being, educational interests, and their aesthetic and recreational enjoyment of the environment in these areas. Pollutants from coal mines also harm the groups' members by contributing to haze which degrades scenic vistas, harming the members' aesthetic and recreational interests.

12.     The unreasonable delay alleged in this Complaint also deprives the Conservation Groups and their members of procedural rights associated with EPA's required duty to take timely final action on their petition. Defendants' failure to respond violates the Conservation Groups' right to a substantive responsive to their petition, and frustrates the Groups' and the Groups' members' ability to participate beneficially in any process established by Defendants in response to the petition. If and when Defendants respond to the petition by beginning a rulemaking process, the Conservation Groups and their members intend to participate in this process, to both contribute to and gain information from it, and will be able to carry out their missions to advocate in favor of air pollution reduction. If carried out properly by Defendants, the resulting regulatory process will likely result in a substantial decrease in methane, ozone, and particulate pollution from coal mines.

13.     A favorable decision in this case would redress the procedural injury caused by EPA's failure to timely take final action on the Petition. The unreasonable delay alleged in this Complaint has injured and will continue to injure the interests of each of the Conservation

Groups and their members, unless and until this Court grants the requested relief. Granting the relief requested in this lawsuit would address these injuries by compelling EPA action.

14. Defendant UNITED STATES ENVIRONMENTAL PROTECTION AGENCY ("EPA") is an agency of the United States Government which administers the Clean Air Act, including Section 111 of the Act (42 U.S.C. § 7411).

15. Defendant LISA P. JACKSON is the Administrator of the EPA. The Administrator is responsible for implementing the Clean Air Act, including Section 111 of the Act (42 U.S.C. § 7411), and for responding to petitions.

## LEGAL BACKGROUND

### I.   THE ADMINISTRATIVE PROCEDURE ACT.

16. The Administrative Procedure Act ("APA") provides that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e).

17. The APA also provides that federal courts may "compel agency action unlawfully upheld or unreasonably delayed ...." 5 U.S.C. § 706(1).

### II.   THE CLEAN AIR ACT.

18. Congress adopted the Clean Air Act in large part "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare...." 42 U.S.C. § 7401(b)(1). To meet this purpose, Congress directed EPA to establish nationwide uniform emission standards for new or modified sources of air pollution in Section 111 of the Clean Air Act. 42 U.S.C. § 7411. In contrast to that part of the Clean Air Act aimed at setting ambient air standards – that is, national standards for the total ambient level of designated

"criteria" pollutants in the air (see 42 U.S.C. §§ 7408-7410. Clean Air Act §§ 108-110) – Section 111 establishes technology-based emissions standards for industrial source categories, known as "new source performance standards" or NSPSs. These NSPSs help the states attain the national standards for criteria air pollutants and also help prevent new pollution problems from arising from other, non-criteria pollutants. By imposing emissions control technology at the time a source is built or modified, regardless of the area's level of air quality, NSPSs ensure that emissions control technologies are built into equipment at the time of construction, rather than the more costly process of attempting to retrofit an existing source later should ambient air quality worsen over time.

19. Under the NSPS provision, the Administrator has the authority to list new categories of stationary sources if they cause, or contribute significantly to, "air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7411(b)(1)(A). The Administrator is statutorily required to continually revise the published list by adding new stationary sources. Id. (Administrator is required to "publish (and from time to time thereafter shall revise) a list of categories of stationary sources"). The Administrator is required to include any source that "causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7411(b)(1)(A).

20. The Clean Air Act defines "Stationary Source" as "any building, structure, facility or installation which emits or may emit any air pollutant." 42 U.S.C. § 7411(a)(3). The Act further defines an "Air Pollutant" as "any air pollution agent or combination of such agents, including any physical, chemical, biological, radioactive ... substance or matter which is emitted into or otherwise enters the ambient air." 42 U.S.C. § 7602(g).

21. Once a type of facility is listed as a stationary source, the Clean Air Act requires that the Administrator propose federal "standards of performance" for <u>new and modified sources</u> within one year of the listing. 42 U.S.C. § 7411(b)(1)(B). These proposed regulations will be subject to a written comment period and the Administrator will promulgate final regulations for new and modified stationary sources no more than a year later. <u>Id.</u> "Standard of performance" is defined as "a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which ... the Administrator determines has been adequately demonstrated." 42 U.S.C. § 7411(a)(1).

22. Concurrent with or after establishing "standards of performance" for new and modified sources, the Clean Air Act requires the Administrator to establish "standards of performance" for <u>existing sources</u>, otherwise known as "designated facilities." 40 C.F.R. § 60.22(a). Such "standards of performance" are only to address a "designated pollutant," or an air pollutant for which air quality criteria have not been established pursuant to Section 108 of the Clean Air Act, that is emitted from a facility not listed as a source category listed under Section 112 of the Clean Air Act, and that would otherwise be regulated under Section 111 of the Clean Air Act if an existing source were a new source. 42 U.S.C. § 7411(d)(1)(A)(i) and (ii); 40 C.F.R. § 60.21(a).

23. "Standards of performance" for existing sources are to be implemented and enforced by States, and must be based on an "emission guideline" published by the Administrator in accordance with 40 C.F.R. § 60.22. An "emission guideline" must reflect "the application of the best system of emission reduction (considering the cost of such reduction) that has been adequately demonstrated for designated facilities, and the time within which

compliance with emission standards of equivalent stringency can be achieved." 40 C.F.R. § 60.22(b)(5). A State must adopt and submit to the Administrator "a plan for the control of "designated pollutants" from "designated facilities" within nine months of the Administrator's publication of final emission guidelines. 40 C.F.R. § 60.23(a).

24. EPA has established NSPSs for scores of stationary pollution sources, including for a subset of facilities that are often constructed at coal mines. See 40 C.F.R. § 60.254 ("Standards for coal processing and conveying equipment, coal storage systems, transfer and loading systems, and open storage piles.") However, EPA has not established NSPSs for coal mines themselves, which usually encompass a wide variety of other technologies and systems that emit air pollutants.

25. The Clean Air Act provides that any citizen may file suit to compel action unreasonably delayed by the Administrator. 42 U.S.C. § 7604(a). Those seeking to file such suits must first provide notice to EPA 180 days before commencing such action. Id.

## STATEMENT OF FACTS

I. **COAL MINES CAUSE OR CONTRIBUTE TO AIR POLLUTION THAT MAY REASONABLY BE ANTICIPATED TO ENDANGER PUBLIC HEALTH AND WELFARE.**

   A. **Coal Mines Cause Methane Pollution That May Reasonably Be Anticipated To Endanger Public Health And Welfare.**

26. The coal mining industry is one of the largest emitters of methane in the United States, accounting for more than 10% of human methane emissions. Methane is a byproduct of coalification, or the process by which organic materials convert into coal. It is stored throughout the surrounding rock strata in varying sized pockets and, due to the greater overburden pressures,

often increases in concentration the deeper the coal seam. Because methane at certain levels can create hazardous working conditions for miners, it must be removed from underground mines. While methane escapes during the processing, transport, and storage of coal, 90% of the emissions come from the actual coal mining process. Methane is emitted from both types of working mines – surface mines and underground mines – as well as abandoned mines. The United States is the second largest emitter of coal mine methane, after China, with 10.5% of the nation's total methane emissions coming from coal mines.

27. Methane is a safety hazard and known public health risk. Methane can create an explosive hazard to coal miners. Methane is also an important greenhouse gas. Methane is more than twenty times more potent than carbon dioxide in terms of its heat trapping capabilities over a 100 year period. Because of methane's potency as a greenhouse gas, EPA has concluded that out of all the non-carbon dioxide greenhouse gases, methane "has the greatest mitigation potential." This is also in part because methane has a significantly short atmospheric lifespan compared to the lifespan of carbon dioxide. Thus, reducing methane emissions could have a greater effect in the short term to mitigate potential climate change harms.

28. The EPA's recent endangerment finding on greenhouse gases highlights the urgency of regulating methane by explaining that with respect to greenhouse gases, it is "not a close case in which the magnitude of the harm is small and probability, great, or the magnitude large and the probability small. In both magnitude and probability, climate change is an enormous problem. The greenhouse gases that are responsible for it" including and especially methane "endanger public health and welfare within the meaning of the Clean Air Act." 74 Fed. Reg. 18904 (Apr. 24, 2009).

29. Methane also contributes to the formation of ground-level ozone pollution, a harmful air pollutant that is the key ingredient of smog. Ozone is designated a "criteria air pollutant" pursuant to Section 108 of the Clean Air Act and National Ambient Air Quality Standards ("NAAQS") have been promulgated to limit ozone throughout the United States pursuant to Section 109 of the Clean Air Act, 42 U.S.C. § 7409. See 40 C.F.R § 50.10. According to the EPA, ozone "can reduce lung function and inflame airways, which can increase respiratory symptoms and aggravate asthma or other lung diseases," and can increase "the risk of premature death from heart or lung disease."

30. Within the coal mining sector, underground mines emit the largest portion of methane into the atmosphere. In 2006, only 31% of the coal mined in the United States came from underground mines, but these mines generated over 60% of coal mining methane emissions. Underground mines remove methane through ventilation systems and through degasification systems known as methane drainage wells. Ventilation systems exchange air in the mine with air at the surface to dilute the concentrations of methane. When the ventilation system cannot remove methane sufficiently to make working conditions safe in the mine, methane drainage wells are constructed. These systems use wells to vent methane prior to, or during the mining of a seam.

31. Numerous systems are in use commercially around the world and in the United States to either oxidize or make energy from ventilation air methane, or to capture or flare methane from drainage well.

32. For coal seams located closer to the surface, mining companies employ surface mining techniques like strip mining and mountain-top removal. The shallower the coal seam, the

less overburden and pressure there is to keep methane in the seam. Shallower seams thus tend to have lower concentrations of methane. Still, surface mines are a significant contributor of coal mine methane into the atmosphere. As with underground mining, various technologies or methods exist to remove and capture methane prior to surface mining.

33.    Closed and/or abandoned mines remain a source of methane pollution into the atmosphere. EPA has estimated that abandoned underground coal mines can emit 8% of the total coal mine methane emissions and post mining operations emit as much as 22%. The same technologies as those applied to active mines can be used, post-mining, to extract methane.

### B.    Coal Mines Cause Particulate Pollution That May Reasonably Be Anticipated To Endanger Public Health And Welfare.

34.    Particulate matter, including total suspended particulates, $PM_{10}$, and $PM_{2.5}$, is released by coal mining operations. Particulate matter is a criteria pollutant for which NAAQS have been established pursuant to Section 109 of the Clean Air Act, 42 U.S.C. § 7409. 40 C.F.R. §§ 50.6, 50.7, and 50.13. According to EPA's AP-42 compendium of emission factors, coal mining activities that can lead to the release of particulate matter, at least in the western United States, include blasting, truck loading, bulldozing, dragline operation, vehicle traffic, and grading. Recent environmental analyses prepared by the U.S. Bureau of Land Management ("BLM") and U.S. Forest Service ("USFS") attest to the fact that coal mining operations — both underground and surface — can release significant amounts of particulate matter. In some cases, particulate matter from coal mining has caused or contributed to exceedances of the $PM_{10}$ NAAQS. For instance, the BLM reports that "[f]rom 2001 through 2006, there were a total of nine exceedances of the 24-hour $PM_{10}$ particulate standards associated with the Black Thunder,

Jacobs Ranch, and North Antelope Rochelle mines" in Wyoming's Powder River Basin and "[i]n 2007, a total of three 24-hour $PM_{10}$ exceedances were reported at these three mines (two at North Antelope Rochelle, [and] one at Black Thunder."

35. According to EPA, the health effects particulate matter include heart attacks; respiratory problems, such as aggravated asthma and chronic bronchitis; and premature death.

### C. Coal Mines Cause Pollution from Volatile Organic Compounds That May Reasonably Be Anticipated To Endanger Public Health And Welfare.

36. Volatile organic compounds ("VOCs") are precursors to ground-level ozone, a criteria air pollutant for which NAAQS have been established, and are regulated under the Clean Air Act. VOCs are often vented along with methane from coal mining operations. EPA's own national emission inventory shows that coal mines can be large sources of VOC emissions. According to 2002 inventory data, coal mining operations, or activities falling under the major SIC code of 12, released more than 1,790 tons of VOCs in the United States.

37. Ground-level ozone, for which VOCs are precursors, endangers public health and welfare. According to EPA, "[g]round-level ozone triggers a variety of health problems even at very low levels, may cause permanent lung damage after long-term exposure, and damages plants and ecosystems." Further, EPA has admitted that: "Numerous scientific studies have linked ground-level ozone exposure to a variety of problems, including: airway irritation, coughing, and pain when taking a deep breath; wheezing and breathing difficulties during exercise or outdoor activities; inflammation, which is much like a sunburn on the skin; aggravation of asthma and increased susceptibility to respiratory illnesses like pneumonia and bronchitis; and, permanent lung damage with repeated exposures."

**D.     Coal Mines Cause Nitrogen Oxides Pollution That May Reasonably Be Anticipated To Endanger Public Health And Welfare.**

38.     Nitrogen oxides ("$NO_x$") are a group of gases that are known to be ground-level ozone and $PM_{2.5}$ precursors and that include nitrogen dioxide ("$NO_2$"), a criteria pollutant for which NAAQS have been established pursuant to Section 109 of the Clean Air Act. Sources of $NO_x$ at coal mines include fugitive emissions from overburden and coal blasting events and tailpipe emissions from mining equipment, and point source emissions from stationary engines, coal-fired hot water generators, and natural-gas fired heaters. The formation of nitrogen dioxide, or $NO_2$, from blasting operations can be especially threatening to public health. As the BLM has explained:

> Blasting that is done to assist in the removal of material overlying the coal (the overburden) can result in emissions of several products, including $NO_2$, as a result of the incomplete combustion of nitrogen-based explosives used in the blasting process. When this occurs, gaseous, orange-colored clouds may be formed and they can drift or be blown off mine permit areas.

EPA has recognized that $NO_x$ emissions from coal mining operations are a major heath concern.

39.     $NO_x$ pollution can endanger public health and welfare. BLM has noted that $NO_2$ "may cause significant toxicity because of its ability to form nitric acid with water in the eye, lung, mucous membranes, and skin," that acute exposure to $NO_2$ "may cause death by damaging the pulmonary system," and that "chronic or repeated exposure to lower concentrations of $NO_2$ may exacerbate preexisting respiratory conditions, or increase the incidence of respiratory infections."

40.     The EPA has recognized that $NO_x$ emissions from coal mining operations are a major heath concern. In comments on the South Gillette Area Coal Lease Applications in the

Powder River Basin of northeastern Wyoming, the agency explained: "EPA is ... concerned about the proximity of the mining operation to homes and school bus stops. Children may be especially susceptible to the health effects of $NO_2$ and fine particulates. Children have greater exposure to air pollution because of their faster breathing rates and the amount of time spent playing outdoors. Particulates and $NO_2$ can aggravate asthma, irritate airways, and cause coughing and breathing difficulties."

## II. PLAINTIFFS' PETITION SEEKING EPA'S LISTING OF COAL MINES AS A SOURCE CATEGORY.

41.    On June 15, 2010, the Conservation Groups sent to Defendants Lisa P. Jackson and the EPA the Petition, requesting that the Administrator:

(1) List coal mines as a category of stationary sources that emit air pollution which may reasonably be anticipated to "endanger public health or welfare" in accordance with 42 U.S.C. § 7411(b)(1)(A);

(2) Establish federal "standards of performance" for new and modified sources within the newly listed stationary source category for coal mines in accordance with 42 U.S.C. § 7411(b)(1)(B); and

(3) Concurrently establish federal "standards of performance" to address emissions of methane from existing facilities within the newly listed stationary source category for coal mines in accordance with 42 U.S.C. § 7411(d)(1) and 40 C.F.R. § 60.22.

The Petition was expressly submitted pursuant to the rulemaking provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(e), and the Clean Air Act, 42 U.S.C. § 7411. The Petition contained evidence and analysis supporting the relief requested, and

demonstrated that air pollution from coal mines may reasonably be anticipated to endanger public health and welfare. The Petition also requested that EPA provide a substantive response within one hundred eighty (180) calendar days.

### III. EPA'S UNREASONABLE DELAY IN RESPONDING TO CONSERVATION GROUPS' PETITION.

42. On July 21, 2010, Director of EPA's Office of Air and Radiation, Stephen Page, acknowledged receipt of the Petition and indicated EPA was evaluating the Petition and the information therein.

43. EPA failed to provide a substantive response to the Petition within one hundred eighty calendar days of the date EPA acknowledged receipt. The Conservation Groups therefore sent a letter to EPA on April 8, 2011 notifying the agency of the groups' intent to sue EPA within 180 days for failure to timely act on the petition. Such a notice letter is required by 42 U.S.C. § 7604(a).

44. EPA received the notice letter on April 13, 2011. The 180 day days required by statute expired on October 10, 2011. As of the filing of this complaint, EPA has failed to grant or deny the Petition.

45. EPA's failure to address Conservation Groups' petition with fifteen months is unreasonable, particularly given that EPA has previously concluded that many of the air pollutants emitted from coal mines – including methane – endanger public health and welfare.

### FIRST CAUSE OF ACTION
(Unreasonable Delay in Responding to the Petition)

46. The allegations in paragraphs 1-45 are incorporated herein by reference.

47. This Court can compel the Administrator to take agency action unreasonably delayed. 42 U.S.C. § 7604(a); 5 U.S.C. § 706(1).

48. It has been 15 months since EPA received the Conservation Groups' Petition seeking to have the agency:

-- List coal mines as a category of stationary sources that emit air pollution which may reasonably be anticipated to "endanger public health or welfare" in accordance with 42 U.S.C. § 7411(b)(1)(A);

-- Establish federal "standards of performance" for new and modified sources within the newly listed stationary source category for coal mines in accordance with 42 U.S.C. § 7411(b)(1)(B); and

-- Concurrently establish federal "standards of performance" to address emissions of methane from existing facilities within the newly listed stationary source category for coal mines in accordance with 42 U.S.C. § 7411(d)(1) and 40 C.F.R. § 60.22.

49. EPA has failed to take final agency action on the Petition.

50. EPA's delay in taking final agency action on the Petition constitutes agency action unreasonable delayed. 5 U.S.C. § 706(1); 42 U.S.C. § 7604(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against the Defendants and provide the following relief:

1. Declare that Defendants' failure to take final action on by either granting or denying Conservation Groups' Petition constitutes agency action unreasonably delayed, pursuant to the APA (5 U.S.C. § 706(1)) and the Clean Air Act (42 U.S.C. § 7604(a));

2.  Order Defendants to grant or deny the Petition within 30 days;

3.  Award Plaintiff costs and reasonable attorneys' fees as authorized by the Clean Air Act, 42 U.S.C. § 7604 and any other statute;

4.  Retain jurisdiction over this action to ensure compliance with this Court's order;

5.  Provide such other declaratory and injunctive relief as the court deems just and proper.


Respectfully submitted November 16, 2011

_____
Robin Cooley (D.C. Bar No. CO0040)
Earthjustice
1400 Glenarm Place, Suite 300
Denver, CO 80202
Telephone: (303) 623-9466
Fax: (303) 623-8083
E-mail: rcooley@earthjustice.org

Attorneys for Plaintiffs WildEarth Guardians et al.