**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| WILDEARTH GUARDIANS, *et al.* | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case no. 1:11-cv-02064-RJL |
| | ) | |
| UNITED STATES ENVIRONMENTAL | ) | |
| PROTECTION AGENCY, *et al.* | ) | |
| Defendants, | ) | |
| | ) | |
| PEABODY ENERGY CORPORATION | ) | |
| Peabody Plaza | ) | |
| 701 Market St. | ) | |
| St. Louis, MO 63101-1826 | ) | |
| (314) 342-3400 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NATIONAL MINING ASSOCIATION | ) | |
| 101 Constitution Ave. NW | ) | |
| Suite 500 East | ) | |
| Washington, D.C. 20001 | ) | |
| (202) 463-2600 | ) | |
| | ) | |
| Applicants for Intervention | ) | |

**PEABODY ENERGY CORPORATION'S AND THE NATIONAL MINING
ASSOCIATION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF THEIR MOTION FOR LEAVE TO INTERVENE AS DEFENDANTS**

Peter S. Glaser, D.C. Bar No. 334714
Merril Hirsh, D.C. Bar No. 366952
Michael H. Higgins, D.C. Bar No. 474952
TROUTMAN SANDERS LLP
401 9th Street, N.W.
Suite 1000
Washington, D.C.  20004-2134
Telephone:     202.274.2950
Facsimile:     202.654.5819
peter.glaser@troutmansanders.com
merril.hirsh@troutmansanders.com
michael.higgins@troutmansanders.com

December 20, 2011

*Counsel for Peabody Energy Corporation and the National Mining Association*

## Table of Contents

Introduction ...................................................................................................................1

Factual Background ........................................................................................................2

   I.   THE MOVANTS' IDENTITY AND INTEREST ........................................2

     A.  Peabody Energy Corporation. ........................................................2

     B.  The National Mining Association. ...................................................2

   II.  THE PLAINTIFFS ...................................................................................3

   III. THE PLAINTIFFS' COMPLAINT ...........................................................6

Argument ........................................................................................................................8

   I.   MOVANTS MAY PROPERLY INTERVENE IN THIS ACTION AS OF RIGHT ..........8

     A.  This Motion Is Timely. ...................................................................9

     B.  The Movants Have an Interest Related to the Subject of
         this Action that May Be Impaired if Plaintiffs Prevail. ................10

       1.  The Movants have an interest in the timing of EPA's action on Plaintiff's Petition. .11

       2.  The Movants have an interest the substantive issues
           that will come before the Court ...............................................13

       3.  Plaintiffs' other litigation makes the Movants' stake even more obvious. .................14

     C.  The Movants' Interests Would Be Impaired if They Are Not Permitted To Intervene. .15

     D.  The Existing Parties Do Not Adequately Represent the Movants' Interests. .................15

   II.  ALTERNATIVELY, THE COURT SHOULD GRANT THE MOVANTS
        PERMISSIVE INTERVENTION. ...................................................................17

Conclusion ....................................................................................................................20

## Table of Authorities

**Page(s)**

**FEDERAL CASES**

*Center for Biological Diversity v. EPA,*
274 F.R.D. 305 (D.D.C. 2011) ...................................................................................... 14, 16

*County of San Miguel v. MacDonald,*
244 F.R.D. 36 (D.D.C. 2007) ....................................................................................... 16, 17

*In Re Endangered Species Act Section 4 Deadline Litigation,*
80 Fed. R. Serv. 3d 663 (D.D.C. 2011) ......................................................................... 14, 16

*Equal Employment Opportunity Comm'n v. Nat'l Children's Ctr.,*
146 F.3d 1042 (D.C. Cir. 1998) .................................................................................... 17, 19

*\*Friends of Animals v. Kempthorne,*
452 F. Supp. 2d 64 (D.D.C. 2006) ........................................................................... 10, 16, 18

*Fund for Animals, Inc. v. Norton,*
322 F.3d 728 (D.C. Cir. 2003) ......................................................................................... 9, 15

*Humane Soc'y of the U.S. v. Clark,*
109 F.R.D. 518 (D.D.C. 1985) ............................................................................................ 19

*Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.,*
105 F.R.D. 106 (D.D.C. 1985) ............................................................................................ 10

*Jones v. Prince George's County,*
348 F.3d 1014 (D.C. Cir. 2003) .......................................................................................... 11

*\*Karsner v. Lothian,*
532 F.3d 876 (D.C. Cir. 2008) ............................................................................................. 9

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ........................................................................................................... 15

*Natural Resources Defense Council v. Costle,*
561 F.2d 904 (D.C. Cir. 1977) ............................................................................................ 13

*People for the Ethical Treatment of Animals v. Babbit,*
151 F.R.D. 6 (D.D.C. 1993) ................................................................................................ 10

*Roeder v. Islamic Republic of Iran,*
333 F.3d 228 (D.C. Cir. 2003) ............................................................................................ 17

*Sierra Club v. Van Antwerp,*
  523 F. Supp.2d 5 (D.D.C. 2007).................................................................18, 19, 20

*Theodore Roosevelt Conservation P'ship v. Salazar,*
  616 F.3d 497 (D.C. Cir. 2010)............................................................................17

*United States v. British Am. Tobacco Australian Servs.,*
  437 F.3d 1235 (D.C. Cir. 2006)............................................................................9

*United States v. Philip Morris USA, Inc.,*
  566 F.3d 1095 (D.C. Cir. 2009)..........................................................................17

*Utahns for Better Transp. v. U.S. Dep't of Transp.,*
  295 F.3d 1111 (10th Cir. 2002)..........................................................................16

*WildEarth Guardians v. Salazar,*
  272 F.R.D. 4 (D.D.C 2010).........................................................................9, 10, 16, 17

*WildEarth Guardians v. Salazar,*
  No. 1:10-cv-01133 (D.D.C. Sept. 20, 2010) ...............................................1, 14, 18

**FEDERAL STATUTES, ADMINISTRATIVE MATERIALS AND RULES**

42 U.S.C. § 7411(b)(1)(A).............................................................................6, 7, 12

42 U.S.C. § 7411(b)(1)(B)...............................................................................6, 12

42 U.S.C. § 7411(d)(1)....................................................................................6, 12

42 U.S.C. § 7411 ...............................................................................................1, 6

40 C.F.R. § 60.22...........................................................................................6, 12

76 Fed. Reg. 65653 (Oct. 24, 2011) .....................................................................7

*Fed. R. Civ. P. 24(a)...........................................................................15, 16, 17, 18

*Fed. R. Civ. P. 24(a)(2)..................................................................................*passim*

*Fed. R. Civ. P. 24(b)............................................................................................18

*Fed. R. Civ. P. 24(b)(1)(B)..........................................................................17, 20

Local Rule 7(m)...................................................................................................1

**OTHER REFERENCES**

http://action.sierraclub.org/site/MessageViewer?em_id=221830.0 ..............................4

http://beyondcoal.org. .................................................................................................................... 4

http://www.biologicaldiversity.org/programs/public_lands/energy/ .............................................. 5

http://www.epa.gov/outreach/sources.html ................................................................................... 8

http://www.sierraclub.org/coal/downloads/coalreport.pdf .............................................................. 4

http://www.wildearthguardians.org/site/PageServer?pagename=priorities_climate_energy
_coal ............................................................................................................................................ 3

\* Authorities chiefly relied upon.

## Introduction

Peabody Energy Corporation ("Peabody") and the National Mining Association ("NMA") (collectively, the "Movants") seek to intervene as defendants in a lawsuit that seeks to reprioritize regulatory priorities so as to place coal companies (like Peabody and the NMA's members) at the top of the list.  Plaintiffs, WildEarth Guardians, Sierra Club, Environmental Integrity Project, and Center for Biological Diversity assert in their Complaint that the United States Environmental Protection Agency ("EPA") unlawfully failed to take action on Plaintiffs' petition for rulemaking, dated June 15, 2010, seeking that EPA begin regulating coal mines under the New Source Performance Standard ("NSPS") program of the Clean Air Act, 42 U.S.C. § 7411 (the "Petition").  Plaintiffs ask this Court to require EPA to act now on Plaintiffs' Petition that EPA (i) list coal mines as an NSPS-regulated source category, (ii) promulgate standards of performance for new and modified coal mines, and (iii) promulgate emission guidelines for existing coal mines.

As more fully explained below, EPA's regulation of coal mines, as Plaintiffs' envision, would substantially affect the interests of the Movants, causing them to suffer direct and significant injury.  Indeed, in *WildEarth Guardians v. Salazar,* No. 1:10-cv-01133 (D.D.C. Sept. 20, 2010), a case filed by two of the same plaintiffs involving an attempt to force immediate action on a similar petition filed with the United States Department of the Interior, Judge Bates granted the NMA and other movants permissive intervention (and, accordingly, did not reach the issue of intervention as of right).

In accordance with Local Rule 7(m), counsel for the Movants conferred with counsel for the other parties to determine whether they oppose the Movants' intervention:  Plaintiffs, as WildEarth Guardians did in the *Salazar* case, have indicated that they will oppose intervention

here.  The United States Department of Justice, counsel for the EPA, has indicated that the EPA

plans to take no position on this motion to intervene.

**Factual Background**

I.    **THE MOVANTS' IDENTITY AND INTEREST**

    A.    **Peabody Energy Corporation.**

Peabody is the world's largest private-sector coal company.  Peabody's products fuel

approximately 10 percent of America's and 2 percent of the world's electricity.  The company

has 345 electricity-generating and industrial customers on five continents.  In the United States,

Peabody's subsidiaries are, taken together, the largest producer of coal in the Powder River

Basin ("PRB") of Wyoming and Montana, operating three large surface mines: North Antelope

Rochelle, Caballo and Rawhide.  Peabody companies also operate three surface mines in the

Southwest, an underground mine in Colorado, and a number of surface and underground mines

in the Illinois Basin.  The company shipped 246 million tons of coal in 2010, nearly 80 percent

of which came from existing coal mines in the United States, and the company has

approximately 9 billion tons of proven and probable coal reserves.

Peabody has established itself as a leader in environmentally sound coal mining practices,

earning numerous honors in 2011, including the *Director's Award*, awarded by the U.S.

Department of the Interior for outstanding achievement in land and habitat restoration at a former

coal mine in Montana, and the *Excellence in Surface Mining* honor, awarded by Wyoming

Department of Environmental Quality to the North Antelope Rochelle Mine for creating superior

habitat and protection for multiple raptor species.

    B.    **The National Mining Association.**

NMA is a national trade association, representing the domestic mining industry.  NMA's

membership includes more than 325 corporations involved in all aspects of the mining industry

- 2 -

including coal, metal and industrial mineral producers; mineral processors; equipment manufacturers; state associations; bulk transporters; engineering firms; consultants; financial institutions, and other companies that supply goods and services to the mining industry. NMA provides a forum for all the diverse segments of the mining industry to come together and advocate public policies designed to protect and expand opportunities for safe, efficient and economical domestic mining. NMA is the only national trade organization that represents the interests of mining before Congress, the Administration, regulatory agencies, and Federal courts.

NMA's members include producers, transporters and consumers of coal. Member companies mine over 75 percent of the coal produced annually in the United States from operations located in 26 states in every coal-producing region of the country. Most of the coal produced by NMA members is sold to electric generating companies that operate coal-fired, steam-powered generating units.

## II. **THE PLAINTIFFS**

The Plaintiffs are environmental organizations that have as one of their highest priorities ending the use of coal as fuel. For example, plaintiff WildEarth states on its website that "Coal is dirty and costs our society dearly. That's why WildEarth Guardians is confronting coal production and consumption to accelerate the transition away from this dirtiest of dirty fuels. Our aim is to expose the true cost of coal and create space for clean energy to take root." http://www.wildearthguardians.org/site/PageServer?pagename=priorities_climate_energy_coal (last visited Dec. 12, 2011).

A recent press release announcing a lawsuit filed by WildEarth Guardians, Sierra Club, and Powder River Basin Resource Council against the U.S. Forest Service – challenging its consent to a lease of Federal coal reserves (*WildEarth Guardians, et al. v. U.S. Forest Service et*

*al.,* Case No. 1:11-cv-03171-JLK (D. Colo. filed Dec. 6, 2011) – asserts:

> 'The Forest Service sadly seems to be leading the charge to destroy the Earth's climate…. Yet given the American public's overwhelming support for clean energy, the agency needs to rethink this dangerously political decision. Dirty energy has no place on our public lands.'

Press Release, Conservation Groups Challenge U.S. Forest Service's Plan for Dirty Coal Strip Mining in National Grassland (Dec. 6, 2011), http://action.sierraclub.org/site/ MessageViewer?em_id=221830.0 (last visited Dec. 12, 2011).

Plaintiff Sierra Club has launched a "Beyond Coal" campaign. *See* http://beyondcoal.org. (last visited Dec. 16, 2011). It advocates that "our current use of coal is neither sustainable nor cheap. Claims of 'clean coal' and 'carbon free' coal are misleading, serving more as a marketing tool than as an honest change in dirty practices…. As we choose our energy future, we need to make sure that we consider the full impact of each decision. When it comes to coal, that means considering all of the damages incurred by our society and our environment." Sierra Club, The Dirty Truth About Coal: Why Yesterday's Technology Should Not Be Part of Tomorrow's Energy Future, 4 (June 2007), http://www.sierraclub.org/coal/downloads/coalreport.pdf (last visited Dec. 12, 2011).

The website of Center for Biological Diversity asserts: "Using public lands for development of dirty fossil fuels like coal poses a significant and swiftly increasing threat to our natural heritage. Coal mining comes with a steep environmental price, dramatically altering the landscape, causing erosion, degrading wildlife habitat, and leading to the deterioration of drinking water." http://www.biologicaldiversity.org/programs/public_lands/energy/ dirty_energy_development/coal/index.html (last visited Dec. 14, 2011).

As part of their effort to end the use of coal, one, another or all of the Plaintiffs have commenced numerous lawsuits, petitions and administrative proceedings attacking in various

ways efforts to lease property for coal mining, to mine coal, or to have a regulatory environment

that allows coal to be mined.  For example, a few of the actions Plaintiffs have initiated *within*

*the last two years* are:

### Matters in Federal District Court

- *WildEarth Guardians et al. v. U.S. Bureau of Land Management,* Case No. 1:11-cv-01481 (D.D.C. filed Aug. 16, 2011) (challenging a decision of the U.S. Bureau of Land Management ("BLM") to lease Federal coal reserves).

- *WildEarth Guardians et al. v. Salazar,* Case No. 1:10-cv-01174 (D.D.C. filed July 13, 2010) (challenging a decision of the BLM to lease Federal coal reserves).

- *WildEarth Guardians et al. v. Salazar,* Case No. 1:11-cv-00670 (D.D.C. filed April 4, 2011) (challenging a decision of the Secretary of the Interior, which denied Plaintiffs' petition to implement a new regulatory system for leasing Federal coal reserves).

- *WildEarth Guardians et al. v. Salazar,* Case No. 1:10-cv-01133 (D.D.C. filed July 1, 2010) (seeking to compel the Secretary of the Interior to act on Plaintiffs' petition for rulemaking to implement a new regulatory system for leasing Federal coal reserves).

- *WildEarth Guardians et al. v. United States Forest Service*, Case No. 1:11-cv-03171 (D. Colo. filed Dec. 6, 2011) (challenging a decision of the U.S. Forest Service ("USFS") to consent to leasing of Federal coal reserves on USFS lands).

### Matters Before the Interior Board of Land Appeals

- *WildEarth Guardians et al.,* IBLA No. 2012-13 (filed Sept. 17, 2011) (administrative challenge to BLM decision to lease Federal coal reserves)

- *WildEarth Guardians et al.,* IBLA 2012-31 (filed Nov. 21, 2011) (administrative challenge to BLM decision to lease Federal coal reserves)

- *WildEarth Guardians et al.,* IBLA 2011-130 (filed April 4, 2011) (administrative challenge to BLM decision to lease Federal coal reserves)

- *WildEarth Guardians et al.,* IBLA 2011-191 (filed July 7, 2011) (administrative challenge to BLM decision to lease Federal coal reserves)

- *WildEarth Guardians et al.,* IBLA 2010-227 (filed Aug 30, 2010) (administrative challenge to BLM decision to lease Federal coal reserves)

**Matters Before US Forest Service**

- *WildEarth Guardians et al.,* (administrative challenge to USFS consent to BLM decision to lease Federal coal reserves)

## III.   THE PLAINTIFFS' COMPLAINT

Plaintiffs' Complaint asks the Court to use the power of mandamus to compel the EPA to

act on a petition that Plaintiffs filed in June 2010.  Compl. ¶2.  The Petition would have the EPA:

- List coal mines as a category of stationary sources that emit air pollution which may reasonably be anticipated to "endanger public health or welfare" in accordance with 42 U.S.C. §7411(b)(1)(A), Compl. ¶2;

- Establish federal "standards of performance" for new and modified sources within the newly listed stationary source category for coal mines in accordance with 42 U.S.C. §7411(b)(1)(B), *id.*; and

- Concurrently establish federal "standards of performance" to address emissions of methane from existing facilities within the newly listed stationary source category for coal mines in accordance with 42 U.S.C. §7411(d)(1) and 40 C.F.R. §60.22.  *Id.*

42 U.S.C. §7411 is a provision of the Clean Air Act, that, as Plaintiffs describe it, "establishes

technology-based emissions standards" (known as "new source performance standards") for

"industrial source categories." *Id.* ¶18.  Section 7411(b)(1)(A) states that the Administrator of

the EPA is "to publish (and *from time to time* thereafter shall revise) a list of categories of

stationary sources," that "cause[], or contribute[] significantly to, air pollution which may

reasonably be anticipated to endanger public health or welfare." *Id.* ¶19 (emphasis added).

As the words "from time to time" reflect, the Administrator is under no deadline to add

new categories of stationary sources.  But, as Plaintiffs point out "[o]nce a type of facility is

listed as a stationary source, the Clean Air Act requires that the Administrator propose federal

'standards of performance' for new and modified sources within one year of the listing," and to

approve final regulations "no more than a year later" that set standards for emissions and

emission reduction.  Compl. ¶21 (citing 42 U.S.C. §7411(b)(1)(B)) (emphasis Plaintiffs').

"EPA has established [new source performance standards] for scores of stationary pollution sources, including for a subset of facilities that are often constructed at coal mines." Compl. ¶24 (citing 40 C.F.R. §60.254).  "However, EPA has not established NSPS's for coal mines themselves."  *Id.*  Instead, the EPA has prioritized its analysis, and recently has proposed rules that, according to the EPA, provide a "streamlined process to ensure that public and private resources are focused on the rules that provide the greatest public health protection and are most likely to warrant revision to include current technology and eliminate obsolete or unnecessary requirements."  New Source Performance Standards (NSPS) Review, 76 Fed. Reg. 65653, 65654 (Oct. 24, 2011).  For example, EPA has promulgated standards for utilities and industrial sites that burn fossil fuels (including coal); for various types of waste facilities, landfills and incinerators; and for various types of plants and facilities producing products such as sulfuric acid, nitric acid, phosphate, lead, steel, copper, zinc, pulp, glass, urethane, asphalt and petroleum. *See* 76 Fed. Reg. at 65656-57.

Plaintiffs, however, believe that the Administration should have different priorities. Plaintiffs do not allege that coal mining (not the ***burning*** of coal, but its ***mining***) is the largest stationary source of pollution, or even the largest source of any of the particular pollutants Plaintiffs assert can be emitted during coal mining.  Rather, Plaintiffs allege that the "coal mining industry is ***one of*** the largest emitters of methane in the United States, accounting for more than 10% of ***human*** methane emissions," Compl. ¶26 (emphasis added), without noting what non-human sources of methane exist, how significant they are, what are the larger sources of human methane, or how much larger they are.  *See* Methane: Sources & Emissions, http://www.epa.gov/outreach/sources.html (last visited Dec. 16, 2011).

- 7 -

Plaintiffs also allege that coal mining either does or can in some amount release other pollutants, Compl. ¶¶34, 36, 38, without suggesting that coal mines are among, or even close to being among, the largest sources of these pollutants.   For example, Plaintiffs allege that a reason why coal mining is a source of nitrogen oxide pollution is that there are "tailpipe emissions from mining equipment," *Id.* ¶38, without discussing what percentage of this pollution comes from these tailpipes as opposed to the untold millions of others used every day.

For purposes of this lawsuit, Plaintiffs allege that they are injured not particularly by the emissions of these alleged pollutants, *per se*, but by that portion of the emissions that come from coal mines (as opposed to other sources, even if they are larger sources).  Compl. ¶11. According to Plaintiffs, their petition that the EPA place priority on the portion of these emissions that come from coal mines has "languished before EPA for more than a year without any action by the agency." *Id.* ¶3.   Plaintiffs do not assert that this is the only petition they have filed before the EPA, or their longest-standing petition.  But, Plaintiffs allege that this delay "permits coal mines to continue to pollute the air without the benefit of standards of performance designed to protect human health." *Id.*

Plaintiffs demand that the Court, among other things, "[o]rder" the EPA and its Administrator "to grant or deny the Petition within 30 days," and "[r]etain jurisdiction over this action to ensure compliance with this Court's order," and "[p]rovide such other declaratory and injunctive relief as the court deems just and proper."  Compl., Prayer for Relief ¶¶2, 4, 5.

## Argument

## I.   MOVANTS MAY PROPERLY INTERVENE IN THIS ACTION AS OF RIGHT.

Federal Rule of Civil Procedure 24(a)(2) provides for intervention as of right.  Rule 24(a)(2) states in pertinent part:

> On timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that the disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2).  Intervention as of right has four requirements: (A) timeliness;

(B) cognizable interest; (C) impairment of interest; and (D) lack of adequate representation.

*Karsner v. Lothian,* 532 F.3d 876, 885 (D.C. Cir. 2008); *Fund for Animals, Inc. v. Norton,* 322

F.3d 728, 731 (D.C. Cir. 2003); *WildEarth Guardians v. Salazar,* 272 F.R.D. 4, 12-13 (D.D.C

2010)  ("*WildEarth*").  The Movants meet each of these requirements.

### A.        This Motion Is Timely.

Courts assess the timeliness of a motion to intervene by examining the circumstances of

the case.  *See Karsner,* 532 F.3d at 886; *WildEarth,* 272 F.R.D. at 12.  The analysis takes into

consideration the amount of time elapsed since the inception of the action, the probability of

prejudice to existing parties, the purpose for which intervention is sought, and the need for

intervention as a means for preserving the putative intervenor's rights.  *See United States v.*

*British Am. Tobacco Australian Servs.,* 437 F.3d 1235, 1238 (D.C. Cir. 2006) (*quoting United*

*States v. Am. Tel. & Tel. Co.,* 642 F.2d 1285, 1295 (D.C. Cir. 1980)).

Plaintiffs filed their Complaint on November 17, 2011.  The Movants are filing this

Motion on December 20, 2011, barely a month later.  At this point, EPA has not answered, and

the Court has not issued a case management order.  The Movants' participation will not delay the

proceeding or require the Court to alter the schedule for any motions.  Thus, the Movants' early

intervention will not prejudice the other parties.  In these circumstances, this Motion is timely.

*See WildEarth,* 272 F.R.D. at 14.

**B.     The Movants Have an Interest Related to the Subject of this Action that May Be Impaired if Plaintiffs Prevail.**

The D.C. Circuit's approach to "determining whether a potential intervenor as of right satisfies the 'interest' requirement under Rule 24(a)(2) has been to look to the 'practical consequences' of denying intervention, rather than to 'revert to a narrow formulation that interest means a specific legal or equitable interest in the chose.'" *Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.,* 105 F.R.D. 106, 109 (D.D.C. 1985) (quoting *Nuesse v. Camp,* 385 F.2d 694, 700 (D.C. Cir. 1967)).  "The test operates in large part as a 'practical guide,' with the aim of disposing of disputes with as many concerned persons as may be compatible with efficiency and due process." *WildEarth,* 272 F.R.D. at 12-13; *see also People for the Ethical Treatment of Animals v. Babbit,* 151 F.R.D. 6, 8 (D.D.C. 1993) ("[T]his requirement is primarily a test for judicial economy and fairness in litigation.").

Thus, in environmental litigation, this Court has not limited the interest at stake to government defendants, on the theory that only the government can comply with the relevant statutes.  *See Friends of Animals v. Kempthorne,* 452 F. Supp. 2d 64, 69 (D.D.C. 2006) ("*Friends of Animals*") (rejecting a narrow construction of Rule 24(a)(2) and permitting hunting organizations to intervene in suit challenging the exclusion of certain species of antelope from ESA prohibitions).  Rather, the Court has held that proposed intervenors of right need only an interest in the litigation – not a cause of action or permission to sue.  *Id.*   "[T]he lack of a cause of action does not, in and of itself, bar a party from intervening."  *Jones v. Prince George's County,* 348 F.3d 1014, 1018 (D.C. Cir. 2003).

Here, the Movants not only have a "practical" interest in the litigation, their interest is more obvious than the Plaintiffs' interest:

1.     **The Movants have an interest in the timing of EPA's action on Plaintiff's Petition.**

One thing the Plaintiffs and the Movants can probably agree upon is that timing is a key issue in this litigation.  But it is not just key for Plaintiffs – it is key for the Movants too.  If, as Plaintiffs assert, the timing of EPA's action on their Petition affects the Plaintiffs because some of their members might be exposed to pollution from coal mines, as opposed to that same pollution from other sources, this timing obviously affects those operating the coal mines.  Only, for the coal mine operators the effect is more direct:  even by Plaintiffs' allegations, coal mining is only one source of pollution; but mines are the ***only*** source of a coal mining business.  Companies that own coal mines, like Peabody and the NMA's members, face imminent economic losses associated with complying with burdensome new regulations.  Also, a precipitous regulatory proceeding, mandated by an order from this Court, would disrupt EPA's deliberations on the Petition to Movants' detriment.  Indeed, that is what Plaintiffs ***hope*** will happen.

In their Petition, Plaintiffs asked EPA to do something remarkable:  to determine that, although coal mines are not by any means the largest stationary sources of air pollution, nor even the largest producers of methane or any of the other individual pollutants discussed in Plaintiffs' complaint, EPA should take up the regulation of coal mines ahead of regulating larger sources of pollution.  Plaintiffs insist that the EPA should:

- List coal mines as a category of stationary sources that emit air pollution which may reasonably be anticipated to "endanger public health or welfare" in accordance with 42 U.S.C. §7411(b)(1)(A), Compl. ¶2;

- Establish federal "standards of performance" for new and modified sources within the newly listed stationary source category for coal mines in accordance with 42 U.S.C. §7411(b)(1)(B), *id.*; and

- Concurrently establish federal "standards of performance" to address emissions of methane from existing facilities within the newly listed stationary source category for coal mines in accordance with 42 U.S.C. §7411(d)(1) and 40 C.F.R. §60.22.  *Id.*

In this lawsuit, Plaintiffs ask the Court to do something even more remarkable:  to use the power of mandamus to order the EPA to put Plaintiffs' petition at the top of its regulatory list, so that the first priority for the agency is whether to accelerate regulation of coal mining ahead of other stationary sources regardless of the relative importance of the sources to clean air.  *See* Compl., Prayer for Relief ¶2.  Typically, after an agency is asked to commence a rulemaking, it will solicit input from a diverse array of stakeholders within the regulated community.  It will also consult with other Federal agencies having related jurisdiction and with the legislative branch.  The agency will carefully consider this information through internal deliberations and ultimately arrive at a reasoned decision.  In this lawsuit, Plaintiffs seek to cut this process short.

The "benefit" Plaintiffs seek by cutting this process would come at Movants' expense.  As the Complaint makes clear, the point of requesting this relief is to ensure that coal mining will be subject to regulation faster than it would be otherwise.  Indeed, that it is exactly the primary harm that, plaintiffs say, warrants this lawsuit.  *See* Compl. ¶2 (alleging that the EPA's delay in acting on its Petition "permits coal mines to continue to pollute the air").  *Compare id.* ¶11 (alleging the "adverse[] affect[] by exposure to ozone and particulate matter caused in part by coal mines" as the primary basis for injury) *with id.* ¶12 (asserting secondarily that the EPA's delay on the Petition "*also* deprives" Plaintiffs of "procedural rights") (emphasis added).

The Movants have a direct and cognizable stake in ensuring that a decision by EPA on the petition is not rushed or otherwise compromised by relief that compels a premature decision.  In *Natural Resources Defense Council v. Costle,* 561 F.2d 904, 909 (D.C. Cir. 1977), the Court recognized this cognizable interest under Fed. R. Civ. P. 24(a)(2) and reversed the denial of a motion to intervene.  There, the Movants were industrial firms who sought to participate in

implementation of a settlement of a lawsuit that would govern the timetable for new regulations applicable to those firms.

### 2.    The Movants have an interest the substantive issues that will come before the Court.

Movants also have a direct and cognizable interest in the resolution of allegations that go beyond timing.  Plaintiffs' Complaint relies on arguing the *merits* of their Petition as a rationale for urging the Court that there is an immediate need for regulatory action.  Plaintiffs allege that "[t]he Petition contained evidence and analysis supporting the relief requested, *and demon-strated* that air pollution *from coal mines* may reasonably be anticipated to endanger public health and welfare."  Compl. ¶41 (emphasis added).  The Complaint alleges, for example, that:

- "[Plaintiffs'] members are adversely affected by exposure to ozone and particulate matter caused in part by coal mines.  The adverse effects of such pollution include actual and/or threatened harm to their health, their families' health, their professional well being, educational interests and their aesthetic and recreational enjoyment[.]"  Compl. ¶11.

- The "coal mining industry is one of the largest emitters of methane in the United States, accounting for more than 10% of human methane emissions," Compl. ¶26, and "[m]ethane is a safety hazard and known public health risk." *Id.*  ¶27.

- Coal mines "can be large sources" of volatile organic compounds, Compl. ¶36, which are in turn "precursors" to ground-level ozone, which, in turn "triggers a variety of health problems." *Id.* ¶37.

- Nitrogen oxide emissions from "fugitive emissions from overburden and coal blasting events and tailpipe emissions from mining equipment," Compl. ¶38, (as opposed to all other blasting, or tailpipe emissions) can endanger public health and welfare. *Id.*  ¶39.

These are not abstract allegations about how long agencies should take to act on petitions.

These are specific allegations that EPA should regulate the Movants' coal mines first, because the Movants' coal mines are truly a priority.  If Plaintiffs are going to allege that coal mines

should be regulated faster because coal mines are a priority, the companies that own those mines should be permitted to argue that this is incorrect.[1]

### 3. Plaintiffs' other litigation makes the Movants' stake even more obvious.

It is not an accident that Plaintiffs are demanding that the Court order EPA to treat coal mining as the highest clean air priority regardless of what priority coal mining actually has. As explained above, at 4-5, it is Plaintiffs' view that coal should not be used for *energy*; and as the numerous proceedings Plaintiffs have filed reflect, Plaintiffs seek to use the legal process in various ways to make it more difficult and expensive to mine coal.

To be clear: Plaintiffs have a legal right to petition EPA. Although the Movants strongly disagree with what Plaintiffs are trying to achieve (here and elsewhere), and do not believe that this lawsuit has merit, the Movants are not saying that Plaintiffs' agenda must be the same as the EPA's or Congress's.

But fair is fair. If Plaintiffs are going to attempt to enlist the Court's aid in reprioritizing regulatory review in the hopes that this will make it more difficult to mine coal, the companies that mine coal are, "as a practical matter," Fed. R. Civ. P. 24(a), the real parties in interest in whether Plaintiffs succeed. The Court should hear both sides, not just Plaintiffs'.

---

[1] Put another way, this is a lawsuit about coal mines, rather than an abstract, scientific question about whether specific pollutants may endanger public health. Plaintiffs desire to accelerate the EPA's regulation of coal mines based on *Plaintiffs' description* of coal mine operations and emissions. As such, coal mine owners deserve to be parties. *Compare Center for Biological Diversity v. EPA,* 274 F.R.D. 305, 310 (D.D.C. 2011) (finding less of an interest for standing purposes in a petition seeking a finding about whether pollutants pose a danger, when that was merely the precondition for then seeking to regulate particular industries); *In Re Endangered Species Act Section 4 Deadline Litigation,* 80 Fed. R. Serv. 3d 663 (D.D.C. 2011) (similar logic applied to petition involving whether a particular species is endangered under the Endangered Species Act), *with WildEarth Guardians v. Salazar,* No. 1:10-cv-01133 (D.D.C. Sept. 20, 2010) (Ex. A attached) (*granting* NMA and others permissive intervention where WildEarth's petition was directed to how land would be classified for coal mines).

**C.     The Movants' Interests Would Be Impaired If They Are Not Permitted To Intervene.**

The Movants also meet the requirement to show that the disposition of this action "may as a practical matter impair or impede [Movants] ability to protect [their] interests."  Fed. R. Civ. P. 24(a)(2).  Under D.C. Circuit law, courts look to the "practical consequences" of denying intervention, and grant intervention based on practical consequences, even where the possibility of future challenges to the outcome of the lawsuit remains an available option for the intervenor. *Fund for Animals,* 322 F.3d at 735.

"[T]here is ordinarily little question" that parties who are the "objects" of governmental action or inaction may be injured by the action or inaction.  *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561-562 (1992).  Here, Plaintiffs' action, if successful, would have the practical effect of adjudicating arguments concerning the relative importance of pollution from coal mines as opposed to other pollution with the goal of placing regulation of coal mines on a faster track. The Movants also stand to lose the benefit of a meaningful opportunity to consult informally with the EPA in advance of EPA's decision, and of unhurried agency decision-making.  The Movants must be allowed to intervene in order to protect their interest in the continued economic viability of their industry and to avoid the concrete harm flowing from this Court granting relief to Plaintiffs – in particular, an order compelling EPA to implement a rulemaking proceeding directed to the Movants.

**D.     The Existing Parties Do Not Adequately Represent the Movants' Interests.**

To satisfy the fourth requirement of Rule 24(a), a movant need show only that representation by other parties *may* be inadequate.  This burden is "*de minimis.*"  *WildEarth,* 272 F.R.D. at 13; *see also County of San Miguel v. MacDonald*, 244 F.R.D. 36, 48 (D.D.C. 2007) (noting "the minimal showing" that must be made to demonstrate inadequate representation).

- 15 -

Here, absent intervention, the Movants would have to rely upon the EPA to represent their interests.

"[G]overnmental entities do not adequately represent the interests of aspiring intervenors." *Friends of Animals,* 452 F. Supp. 2d at 70 (citation omitted).  Although EPA may be expected to defend against Plaintiffs' lawsuit, EPA is not charged with representing the private interests of the Movants. *See County of San Miguel,* 244 F.R.D. at 48 (noting that even a "shared interest" in the outcome of litigation "does not guarantee adequate representation" of a putative intervenor by a government agency.)  Representation of both the public and private interest is "'on its face impossible' and creates the kind of conflict that 'satisfies the minimal burden of showing inadequacy of representation.'"  *Utahns for Better Transp. v. U.S. Dep't of Transp.,* 295 F.3d 1111, 1117 (10th Cir. 2002) (citation omitted).

For these reasons, the Movants have met the minimal burden to show that the present representation *may* be inadequate.[2]

---

[2] D.C. Circuit law is not clear on whether a party that seeks intervention as of right as a **defendant** in a lawsuit must independently show Article III standing.  In *Roeder v. Islamic Republic of Iran,* 333 F.3d 228 (D.C. Cir. 2003), the Court suggested the answer is "no" because "[r]equiring standing of someone who seeks to intervene as a defendant runs into the doctrine that the standing inquiry is directed at those who invoke the court's jurisdiction." 333 F.3d at 233 (citation omitted).   However, other cases seem to refer to standing in general terms, as being a requirement, without clarifying whether this refers to plaintiffs or all intervenors.  *See United States v. Philip Morris USA, Inc.,* 566 F.3d 1095, 1146 (D.C. Cir. 2009); *cf. Center for Biological Diversity,* 274 F.R.D. at 310, 313 (analyzing standing to intervention as of right by defendants without noting the distinction between plaintiffs and defendants; expressing uncertainty about whether standing it an issue for permissive intervention at all); *Endangered Species Act Section 4 Deadline Litigation, supra.* (similar approach).  In any event, here standing analysis would lead to the same result.  "[A]ny person who satisfies Rule 24(a) will also meet Article III's standing requirement." *Roeder,* 333 F.3d at 233; *Philip Morris,* 566 F.3d at 1146-47 (finding standing based on the same rationale as the Court finds the intervention proper); *WildEarth,* 272 F.R.D. at 13, n.5 ("generally speaking, when a putative intervenor has a 'legally protected' interest under *Rule 24(a),* it will also meet constitutional standing requirements, and *vice versa*"); *County of San Miguel v. MacDonald,* 244 F.R.D. at 46 (a showing of proper standing compels the conclusion that an intervenor has a legally-protected interest).  And in a

## II.    ALTERNATIVELY, THE COURT SHOULD GRANT THE MOVANTS PERMISSIVE INTERVENTION.

In the alternative, the Movants should be granted permissive intervention under Fed. R. Civ. P. 24(b)(1)(B).  In relevant part, this rule provides: "On timely motion, the court may permit anyone to intervene who. . . has a claim or defense that shares with the main action a common question of law or fact."  In the D.C. Circuit, permissive intervention rests upon on three factors: "(1) an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action." *Equal Employment Opportunity Comm'n v. Nat'l Children's Ctr.,* 146 F.3d 1042, 1046 (D.C. Cir. 1998).  In addition, the Court "shall consider whether the requested intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Friends of Animals,* 452 F. Supp. 2d at 68 (quoting Fed. R. Civ. P. 24(b)).  Permissive intervention is an inherently discretionary enterprise and "the court enjoys considerable latitude under Rule 24(b)." *Sierra Club v. Van Antwerp,* 523 F. Supp.2d 5, 10 (D.D.C. 2007).

In *WildEarth Guardians v. Salazar,* No. 1:10-cv-01133 (D.D.C. Sept. 20, 2010), Judge Bates considered a similar situation to the circumstances here.  There, two of the same plaintiffs in this lawsuit brought an action to compel the Secretary of the Interior to act on their petition for

---

lawsuit concerning whether pollution from coal mines is significant enough to require regulation, Peabody has standing.

Just as Plaintiffs would urge for themselves, NMA meets the familiar test applicable to associational standing: "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and, (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Theodore Roosevelt Conservation P'ship v. Salazar,* 616 F.3d 497, 507 (D.C. Cir. 2010) (citation omitted).  Here, a company that mines coal, like Peabody, would have standing to sue in its own right; NMA seeks to protect interests that are central to its purpose of ensuring that its members' operations continue to be viable and subject to legitimate regulations that result from reasoned decision-making; and, although Peabody has chosen to participate here, the claims and relief do not require individual NMA members to participate.

rulemaking to recertify the Powder River Basin as a coal production region. The NMA, the Wyoming Mining Association, and the State of Wyoming sought to leave to intervene under Fed. R. Civ. P. 24(a) and (b), arguing that if the petition were granted, the recertification would change the regulatory framework for obtaining coal leases from the BLM.  WildEarth Guardians, as a plaintiff there, "argu[ed] essentially that none of the intervenors has an interest in this action alleging unreasonable delay by defendants, for all that is at issue is the timing of defendants' decision on plaintiff's administrative petition."  Slip op. at 1.

Judge Bates, however, rejected this argument finding "that the proposed intervenors have satisfied the requirements for permissive intervention."  *Id.*  As he explained, "In this unreasonable delay action, one significant issue will be the amount of time that may be considered reasonable for defendants to act on plaintiff's administrative petition.  The proposed intervenors have represented that they have information that bears on that inquiry, proffering, inter alia, that, as entities significantly affected by the resolution of plaintiff's administrative petition, they intend to request that the agency's action on the petition be handled through a rulemaking proceeding because it may result in a 'radical restructuring' of the regulatory regime."  *Id.* at 2 (citing NMA's Motion to Intervene at 13-18).  The Court added the Intervenors "also submit that they will be heavily involved as defendants move towards a decision on plaintiff's administrative petition because defendants are likely to seek input from affected stakeholders."  *Id.*

The same is true for Movants here.  First, the Movants' intervention satisfies the independent subject matter jurisdiction requirement because their interests arise from Plaintiffs' claims.  "Requiring an independent basis for jurisdiction makes sense in cases involving permissive intervention, because the typical movant asks the district court to adjudicate an

additional claim on the merits." *EEOC,* 146 F.3d at 1046.  In this case, however, the Movants are not asking the Court to adjudicate additional claims.  On the contrary, the Movants seek to *defend* against Plaintiffs' lawsuit against EPA.  Because this Court has jurisdiction over Plaintiffs' claims under the APA (assuming that Plaintiffs have proper standing to challenge agency action) and because Movants seek intervention only to defend against these claims, the Movants satisfy the requirement for subject matter jurisdiction.  *See Van Antwerp,* 523 F. Supp. 2d at 10 (holding developer had established grounds for subject matter jurisdiction by intervening as defendant in Clean Water Act and Endangered Species Act action).

Second, the timeliness requirement seeks to prevent undue delay or prejudice to the original parties.  *EEOC,* 146 F.3d at 1047; *Humane Soc'y of the U.S. v. Clark,* 109 F.R.D. 518, 521 (D.D.C. 1985).  As described above, given the early stage of this lawsuit and the Movants' intention to comply with scheduling orders issued by the Court, the Movants' participation is timely and will not prejudice any of the parties.

Third, the Movants seek intervention to defend EPA against the claims alleged in the Complaint.  Those claims ostensibly challenge the timeliness of EPA's consideration of Plaintiffs' underlying petition, as part of Plaintiffs' larger effort to compel EPA to impose a new regulatory paradigm on the coal industry.  The defenses that the Movants seek to interpose will necessarily relate to common questions of law and fact, and these defenses undoubtedly will have a substantial connection with the defenses EPA will raise.  *See Van Antwerp,* 523 F. Supp. 2d at 10 (finding commonality where intervenor presented defenses to "the precise claims brought by plaintiffs").  The Movants meet all the criteria prescribed by Rule 24(b)(1)(B) and therefore should be granted permissive intervention.

## Conclusion

For the reasons forth above, the Court should grant the Movants' Motion for Leave to Intervene either as of right pursuant to Fed. R. Civ. P. 24(a)(2), or permissively pursuant to Fed. R. Civ. P. 24(b)(1)(B).

Dated: December 20, 2011                     Respectfully submitted,


                                             /s/ Merril Hirsh
                                             Peter S. Glaser, D.C. Bar No. 334714
                                             Merril Hirsh, D.C. Bar No. 366952
                                             Michael H. Higgins, D.C. Bar No. 474952
                                             TROUTMAN SANDERS LLP
                                             401 9th Street, N.W.
                                             Suite 1000
                                             Washington, D.C.  20004-2134
                                             Telephone:     202.274.2950
                                             Facsimile:     202.654.5819
                                             peter.glaser@troutmansanders.com
                                             merril.hirsh@troutmansanders.com
                                             michael.higgins@troutmansanders.com

*Counsel for Peabody Energy Corporation and the National Mining Association*